UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN



JOHN DOE,
    Plaintiff,

V.

SUSAN L. TORRES, ANDREW WITT,
and SHARON HARTER,
    Defendants.

24-C-1144

## COMPLAINT

COMES NOW, Plaintiff, John Doe (a pseudonym), pro se, who alleges as follows:

### INTRODUCTION

This is a civil action alleging violations of the Plaintiff's constitutional rights under the United States Constitution and Medical Malpractice under Wisconsin State Law. Plaintiff was subjected to sexual abuse and harassment, verbal and emotional abuse, was retaliated against for asking his parents to advocate on his behalf, and was ignored and not prevented from attempting suicide, when he sought help. Plaintiff seeks damages for the mental, emotional and physical injuries he suffered and continues to suffer as a result of the Defendants' conduct.

### PARTIES

1. Plaintiff, John Doe, is an adult prisoner in the custody of the Wisconsin Department of Corrections. He is seriously mentally ill and has a significant history of mental health issues, self-harm, suicide attempts and trauma.

2. Defendant, Susan L. Torres, is a former State employee, having been employed at the Wisconsin Resource Center (WRC) as a Social Worker and Psychological Associate. Ms. Torres has held State of Wisconsin licenses as a Clinical Social Worker and a School Social Worker.

3. Defendant, Andrew Witt, was at times relevant, employed at WRC as an Institution Unit Supervisor (IUS).

4. Defendant, Sharon Harter, was at times relevant, the

Deputy Director at WRC.

5. Relevant to the claims presented in this complaint, each defendant is sued in their individual capacity and have acted under color of state law by virtue of their employment at WRC, a state mental health facility.

## JURISDICTION AND VENUE

6. This action arises under the First and Eighth Amendments to the United States Constitution, 42 U.S.C §1983 and Wisconsin State Law.

7. The jurisdiction of this court is predicated on 28 U.S.C. §§1331 and 1367(a).

8. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to this action occurred in Winnebago County, Wisconsin, within the United States Eastern District of Wisconsin.

## ALLEGATIONS OF FACT

9. On July 7, 2021, Plaintiff was admitted to WRC following a referral from Green Bay Correctional Institution to engage in trauma treatment. The referral noted Plaintiff "has an extensive history of abuse and traumatic events, which have led to his lengthy mental health history." Plaintiff was housed on unit H-17 where Ms. Torres was the unit's assigned Psychological Associate, and Mr. Witt was a unit Psychiatric Care Supervisor and later the unit's IUS.

10. As a Licensed Clinical Social Worker, Ms. Torres was bound by, inter alia, a code of conduct that prohibits certain Unprofessional Conduct as set forth in MPSW 20.02, Wis. Adm. Code. which states in part, "Unprofessional conduct related to the practice [of Social Work], includes engaging in, attempting to engage in, or aiding or abetting the following conduct:
...
(2)Violating a law of any jurisdiction, the circumstances of which substantially relate to the practice under the credential.
...(7) Reporting distorted, false, or misleading information or making false statements in practice.
...(10) Revealing facts, data, information records or communication received from a client in a professional capacity...
(11) Engaging in sexual contact, sexual conduct, or any other

behavior which could reasonably be construed as seductive, romantic, harassing, or exploitative, with:
    (a) A client.
    (b) A former client, regardless of the amount of time that has passed since the termination of professional services.
...(13) Failing to avoid dual relationships that may impair the credentialed person's objectivity or create a conflict of interest. Dual relationships prohibited to credentialed persons include the credentialed person's employers, employees, supervisors, supervisees, close friends or relatives, and any other person with whom the credentialed person shares any important continuing relationship.
(13g) Developing a personal relationship with a former client that would impact the credentialed person's objectivity. This restriction shall apply for two years following the termination of the credential holder-client relationship.
(13r) Taking unfair advantage of any professional relationship, or exploiting clients, students, or supervisees.
(14) Failing to conduct an assessment, evaluation, or diagnosis as a basis for treatment.
...(21) Failing to make reasonable efforts to notify a client or a client's authorized representative when professional services will be interrupted or terminated by the credential holder.
(22) Gross negligence in practice in a single instance, or negligence in practice in more than one instance...."

    11. Between July 7, 2021 and June 23, 2023, Plaintiff met with Ms. Torres, as she was his assigned clinician. Initially, Ms. Torres met with Plaintiff for "supportive contacts" and safety checks. In or around October 2021, Plaintiff and Ms. Torres shifted the focus of therapy to trauma, specifically beginning Eye Movement Desensitization and Reprocessing (EMDR), a therapy used to process traumatic experiences and decrease trauma-related symptoms. Most weeks Ms. Torres met with Plaintiff at least twice for scheduled sessions; they regularly met more often for various reasons. These contacts primarily took place in a small conference room or Ms. Torres' office.

12. During contacts, Plaintiff and Ms. Torres regularly discussed a wide range of topics not necessarily related to trauma or therapy, and took mutual pleasure in debating and arguing about current events, politics and other topics. However, these discussions quickly started leading to actual conflict, where Ms. Torres would raise her voice, sometimes yelling at Plaintiff. On several occasions, either on her own or after Plaintiff's calmly suggesting it, Ms. Torres would sit silently for up to several minutes in order to calm down before resuming dialogue with Plaintiff.

13. On one occasion, Ms. Torres became upset during session when she read Plaintiff's diary entry regarding a conversation he had with another clinician about his hesitation to reach out to Ms. Torres when he was in crisis. Ms. Torres loudly slapped her hand on the table using her ring to increase the loudness of the sudden sound, yelled at Plaintiff, "IT PISSES ME OFF WHEN YOU TALK TO OTHER THERAPISTS..." She complained that other clinicians don't understand her position and duties on a maximum security unit. This triggered Plaintiff to have a flashback to an incident of trauma, and he became scared, angry, ashamed and went into a dissociative state, remaining silent, as Ms. Torres continued her verbal attack. Eventually Ms. Torres became silent, and when Plaintiff would not respond to her, she read a guided imagery meditation to Plaintiff. Plaintiff later self-harmed by cutting himself to cope with the stress of being triggered by Ms. Torres.

14. From the beginning of their relationship in July 2021, Ms. Torres was aware that Plaintiff had a significant history of trauma and self injury and suicide attempts. She knew that because of Plaintiff's specific history and mental health issues, combined with the nature of the therapeutic relationship, her actions or inaction would have a significant impact on Plaintiff and his mental health, that any behavior she exhibited that was abusive, triggering, or remotely sexual in nature, would carry much more weight and significance than if it occurred in any other type of relationship. She thus had a duty to be acutely aware of her actions and how they would affect Plaintiff, and not engage in any behavior that would be triggering or harmful

to Plaintiff, including things like yelling at Plaintiff, arguing with him, engaging in personal conversations, disclosing personal information to Plaintiff, blaming Plaintiff for her own inappropriate behavior and negative emotions, relying on Plaintiff as a support or someone to vent to, or engaging in any behavior which could be construed and seductive, romantic, sexual or exploitative.

15. During their relationship, Ms. Torres on multiple occasions talked about her personal appearance in a way unacceptable by professional standards. For example, in referencing her physical attractiveness, she once commented that she was "the best looking 36-year old." She also commented that among herself and two of her co-workers whom Plaintiff had professional relationships with, she was the "best looking."

16. Ms. Torres at various times disclosed personal information about herself to Plaintiff, including, for example, details about her relationship with her husband, Joe Torres, and other family members, her interests (running, weight-lifting, spending time in nature, being an animal lover), politcal views (being a progressive, commenting "I'm a Bernie girl," and her hate for former President Trump). Ms. Torres routinely made inappropriate and unethical comments of a sexual nature that became more inappropriate over time.

17. Ms. Torres told Plaintiff on several occasions her only rules for him were "Don't show me your penis and don't tell me you love me. Everything else is OK." She would say this with a smile in a way that Plaintiff believed was meant as flirting.

18. Ms. Torres told Plaintiff her communication style with him was "inappropriate" but it worked for their relationship. She later said it wasn't so much inappropriate as it was "irreverent." She stated she had to be careful she didn't talk to other clients the same way because it was "flirtatious."

19. At one point Plaintiff informed Ms. Torres that another resident on the unit was talking about her in a sexually inappropriate manner, and said Ms. Torres had exposed herself to him, that they didn't actually do therapy, they just talked. Ms. Torres did not deny this, and instead thanked Plaintiff and asked him if this made Plaintiff jealous. Plaintiff was extremely uncomfortable and ashamed, but indicated that it did make him somewhat

Case 2:24-cv-01144-PP    Filed 09/09/24    Page 5 of 19    Document 1
5

jealous. Because Plaintiff had written about the other resident's comments in Plaintiff's journal he shared with Ms. Torres, Ms. Torres said she wanted Plaintiff to shred said journal in her office. Ms. Torres proceeded to bend over at the waist directly in front of and facing away from Plaintiff, claiming to be making sure her paper shredder was plugged in. While still bent over, Ms. Torres turned her head back to Plaintiff, who was respectfully not looking directly at Ms. Torres, and she said Plaintiff's name to get his attention. When Plaintiff shifted his eyes to Ms. Torres, she smiled provocatively while remaining bent over for several seconds, then stood up and said it was already plugged in and directed Plaintiff to shred his journal.

20. Near the beginning of their relationship, Ms. Torres told Plaintiff that sessions were confidential. She explained that not only would she not disclose anything Plaintiff said or did in session, but that she expected Plaintiff not to talk about things she said or did in session. While this seemed reasonable to Plaintiff at the time, it became apparent that this was part of Ms. Torres' grooming of Plaintiff to keep him from reporting her inappropriate behavior.

21. During a session Ms. Torres and Plaintiff were discussing the draft opinion of the Supreme Court that had been leaked indicating that they were overturning Roe v. Wade. Ms. Torres stated, "I'm not letting a bunch of old white men tell me what I can and can't do with my vagina; this is my vagina and I'll do whatever I want with it." Ms. Torres proceeded to touch her pubic region as she said this and appeared to rub herself through her pants in a sexual manner while smiling at Plaintiff for approximately ten seconds.

22. On another occasion Plaintiff was discussing with Ms Torres an assignment she had given him which included identifying ways Plaintiff got in touch with himself spiritually. Plaintiff told Ms. Torres he didn't want to share what he had come up with because he didn't want Ms. Torres to get mad. Ms. Torres then said with a smile and in a flirtatious manner, "What, is it when you're having sex?" Nothing Plaintiff said had indicated that anything of a sexual nature was relevant. Plaintiff was extremely

uncomfortable, and this triggered a sense of shame. Plaintiff replied that no, it had to do with when he nearly died as a result of suicide attempts. Plaintiff explained that he felt most spiritual in those moments because there was clearly a higher power keeping him alive, and that he didn't want to tell Ms. Torres this because she had gotten angry in the past when Plaintiff had talked about suicide in a flippant way, and he was afraid she would get angry.

23. Ms. Torres on several occasions talked about her anger and frustration that she was often the subject of rumors or investigations of fraternization and sexual misconduct with clients. During one such conversation, Ms. Torres said that she understood to an extent. "Who doesn't want to bang their therapist? I know you want to," she commented to Plaintiff. This caused Plaintiff to feel ashamed and scared.

24. On February 14, 2023, following their regularly scheduled session, Plaintiff was walking out of Ms. Torres' office, when she said, "Oh, [Plaintiff's first name]. I almost forgot. Happy Valentine's day." She smiled at Plaintiff, and Plaintiff, feeling dirty, ashamed and uncomfortable, replied, "Um, yeah. Happy Valentine's Day," and walked away because he felt so confused, ashamed and conflicted.

25. Ms. Torres was discussing with Plaintiff that she had no plan to leave the institution, when Plaintiff expressed that he feared abandonment because he had three previous clinicians quit suddenly, two of whom had promised that they were not going anywhere any time soon. Ms. Torres explained that there had been a time when she considered quitting but thought about all of the gifts her clients had given her over the years to show their appreciation, and this caused her to stay committed to working at WRC. Ms. Torres specifically talked about a jewelry box Plaintiff had previously made for her that had a heart on it and had "To my favorite Progressive" written on it. She said she liked getting gifts like that and told Plaintiff he should keep that in mind, implying he should continue to give her gifts if he wanted to continue working with her. On another occasion, she expressed envy for people she knew that were clinicians in the community who didn't have to worry about being accused of fraternization,

and whose clients would give them gifts in addition to paying their per session rate, and could even hug their clients. Plaintiff took this as reaffirmation that Ms. Torres was requesting gifts. Plaintiff felt uncomfortable and ashamed during that dialogue. He continued to be confused about the mixed messages Ms. Torres expressed, but did his best to do what Ms. Torres asked of him.

26. During one conversation Ms. Torres expressed frustration with other WRC staff and how they treated Plaintiff with "kid gloves" and said they looked at Plaintiff as fragile. She called Plaintiff WRC's "Golden Boy" which became a nickname she occasionally used for Plaintiff. She frequently expressed her frustration that other staff were hurting Plaintiff and his future by how they treated him, which caused Plaintiff to be uncomfortable seeking help from anyone except Ms. Torres. During one of these conversations, Plaintiff told Ms. Torres that a staff member had told him that if he ever felt like harming himself he could have that staff member called and she would come talk with him. Plaintiff proudly explained to Ms. Torres that he knew this was something Ms. Torres had made clear was problematic and that he told the staff member that Ms. Torres would not think that was good for Plaintiff. Ms. Torres praised Plaintiff then commented that it wasn't as if that staff member was going to be there when Plaintiff got out of prison and made a comment about they're not going to give Plaintiff their personal phone number to be there for Plaintiff. She then said she would be there for Plaintiff when he got out of prison and said he could call her any time. She also stated that other residents sometimes complained that she gave Plaintiff special treatment, then stated she agreed, she did give him special treatment.

27. Another conversation Ms. Torres had with Plaintiff included Ms. Torres stating, "Sometimes I feel like we have a relationship like a married couple."

28. Ms. Torres once playfully grabbed a stack of DVD movies off of a cart that Plaintiff used to deliver movies to each unit as part of his job duties as a "State Runner." She quickly took them into her office making Plaintiff chase her, and she playfully

held the DVDs out of Plaintiff's reach before giving them back. This was clearly done in a playful way Plaintiff perceived as flirtatious given the context of Ms. Torres' previous behavior. Ms. Torres later talked about this instance during session. She stated she liked when they were playful with each other and contrasted it by saying when Plaintiff got upset with her when she cancelled his appointments it made Plaintiff "less attractive" to her.

29. Ms. Torres told Plaintiff if he asked to be seen, she would see him the same day. On several occasions Plaintiff asked to be seen and Ms. Torres would not in fact see Plaintiff, then Plaintiff would express frustration with this because it created conflict between Plaintiff and other staff who were not aware of the agreement. This on multiple occasions caused Plaintiff to be placed in observation status by other staff members.

30. At some point in late 2022, Plaintiff and Ms. Torres were discussing working out and exercise. Plaintiff stated he didn't like doing leg exercises. Ms. Torres responded, "Well you need to start, or find some clothes that fit better." As she finished this statement she reached out and grabbed Plaintiff's pants leg near his knee, then slowly moved her hand up Plaintiff's thigh/inner leg and grabbed Plaintiff's genitals for 2 or 3 seconds. The conversation then continued as if nothing happened. Plaintiff felt extremely ashamed, violated, dirty, confused and distraught.

31. Eventually, there was more conflict between Plaintiff and Ms. Torres. Ms. Torres went on a minutes long tirade, yelling at Plaintiff that she feels like she's walking on egg shells. "I can't even swear when we meet because I don't want you to get angry," she yelled at Plaintiff, noting that Plaintiff had been making an effort to eliminate vulgur language from his vocabulary. Ms. Torres said this made her uncomfortable, and said she wanted to feel OK using vulgur language. She said she wanted to feel free to say "fuck" and "cunt" because these are regular parts of her own vocabulary. She referenced telling her husband in reference to her daughter, "Joe, she's being a little cunt." Plaintiff felt scared and ashamed, that Ms. Torres was blaming him for her not being comfortable in the relationship. Plaintiff

told Ms. Torres he was OK with whatever language she used, that if it helped make her feel better, Plaintiff would start using cuss words and they proceeded to joke around using the words fuck and cunt unnecessarily in addition to other vulgarities. Ms. Torres also expressed dissatisfaction with the relationship, specifically that she "missed" Plaintiff "flirting and being playful."

  32. At some point in 2023, Ms. Torres flipped the script and complained that Plaintiff was too focused on the relationship. Plaintiff had had enough. He told Ms. Torres he wanted to stop meeting with her, there was too much arguing, it was causing Plaintiff too much stress. Plaintiff said "Susan, I am done. We are done. This is toxic and I can't do it anymore." Plaintiff then stood up and started walking out of the conference room. Ms. Torres yelled Plaintiff's first name then commanded him to "Sit back down! Come back and sit down! You don't mean what you're saying, you're just angry right now." Plaintiff did as Ms. Torres commanded, feeling ashamed, helpless, and scared. All trauma responses. Plaintiff then told Ms. Torres he was scared she was going to hurt him. Ms. Torres responded, "[Plaintiff's first name], I know enough of your personal information that if I wanted to hurt you I could, but I haven't." When Plaintiff said that sounded like a threat, Ms. Torres said it wasn't a threat, she meant it to be reassuring and an example that she could be trusted. This caused Plaintiff to be scared anyway.

  33. Plaintiff made an effort to be mindful of Ms. Torres' needs and agreed to keep meeting with her. Ms. Torres had stated they needed to work on relationship repair, so Plaintiff made an effort to independently learn better communication techniques, made sure to ask Ms. Torres about what she needed from him, asked her how she was feeling and what her thoughts were about various things during sessions so she didn't feel like she was walking on eggshells. Plaintiff made an effort to be more playful and joking in session. Ms. Torres had even complained to another clinician about her relationship with Plaintiff in a June 5 email in which she stated, "I feel trapped by him. There are literally no good moments. No joking moments. No happiness. It is all critiquing everything I say or being overly emotional that I somehow

injured him by answering his questions in a direct fashion." However, despite Ms. Torres having these negative views and telling Plaintiff they needed to work on relationship repair, she conversely documented in Plaintiff's file that he was too focused on their relationship. This all was extremely confusing to Plaintiff and made him feel ashamed, stupid, worthless and defective, like no matter what he did he was wrong.

34. Plaintiff often felt confused, ashamed, worthless, defective and like no matter what he did he was wrong because Ms. Torres would constantly change her views on things or complain that Plaintiff didn't do exactly what she expected of him despite his best efforts to meet her expectations. She would tell Plaintiff he needed to journal, then complain that he journaled too much. She gave Plaintiff an assignment to list various coping mechanisms, then after being dissatisfied with one of the first things Plaintiff identified, she disregarded the rest of the assignment and blamed Plaintiff for not doing what she asked of him. After one of their many arguments, Plaintiff apologized to Ms. Torres for not meeting her expectations and causing her so much stress. She thanked Plaintiff for his apology and said she "deserved" a "trophy" for working with him, and asked if Plaintiff was going to get her a trophy. Plaintiff laughed and said he would see what he could do. Plaintiff felt horrible on the inside. He felt ahamed and worthless, embarrassed and stressed.

35. On June 21, 2023, Ms. Torres and Plaintiff were discussing a situation where another resident had made inappropriate sexual comments about Ms. Torres at the lunch table. Plaintiff had told the resident not to say those types of things and the situation escalated with Plaintiff standing over the other resident telling him he needed to stop saying inappropriate things about Ms. Torres. The other resident had commented that Ms. Torres was showing her breasts to another resident. Ms. Torres thanked Plaintiff for defending her, and proceeded to joke that "If I were getting fired or retiring, I'd walk out of here on my last day and show everyone my titties. I'd be flashing everybody and not caring." Plaintiff responded that there was a time that type of statement

from her would have made Plaintiff uncomfortable but after everything they'd been through, Plaintiff knew that was normal. Plaintiff, in fact was internally confused, ashamed and stressed. He did not feel right, felt dirty, yet he couldn't really understand his feelings because Ms. Torres was supposed to care about him and not hurt him, so he felt it was his fault that he felt negative emotions.

36. Ms. Torres' conduct was abusive and unethical. It caused Plaintiff's mental health to deteriorate and caused him harm. It increased Plaintiff's self-harm behavior and suicidal ideation and suicide attempts. The nature of the therapist-client relationship in the context of trauma therapy especially amplified the harm caused by Ms. Torres' sexual comments, her emotional abuse and apparent gaslighting and manipulation of Plaintiff. She had a duty not to engage in the behaviors described, and her behaviors fell far below any accepted standard of care and violated her code of ethics. Ms. Torres took advantage of and exploited Plaintiff and the transference-countertransference phenomena, and concsiously disregarded the harm her behavior would cause Plaintiff. She knew that Plaintiff was extremely vulnerable and susceptible to significant harm as a result of her behavior because in general her behavior was harmful, but was even more harmful because she was aware of Plaintiff's extensive history of mental health issues, self-harm, suicide attempts/ideation and trauma. Her conduct fell so far below any reasonable standard of care that no reasonable therapist would agree that it was appropriate.

37. Upon information and belief, during the time Ms. Torres and Plaintiff were meeting, she engaged in a dual relationship prohibited by law and her code of ethics by having a sexual relationship with a former client, and this impacted her treatment of Plaintiff. (Plaintiff is not naming this person in this Complaint to protect his privacy as a victim of Ms. Torres' sexual abuse. Plaintiff will disclose this person's identity to the Court and defendants upon request and assurance it will remain confidential.) Ms. Torres' attitudes and feelings about her sexual relationship with this other client interfered with her treatment

of Plaintiff and caused Plaintiff harm. Ms. Torres knew she had a duty to not engage in such a relationship and that doing so would interfere with her treatment of other clients. Ms. Torres took out her negative feelings and guilt regarding that relationship on Plaintiff, an example of transference, which Ms. Torres was aware of and knew would cause Plaintiff harm. She had a duty not to allow this but disregarded it to fulfill her own sexual desires.

38. Ms. Torres also on multiple occasions intentionally and inappropriately disclosed information and communications of Plaintiff that he shared in the context of the therapeutic relationship to third parties, including the former client she was having sex with. When she was notified she was under investigation, she violated Plaintiff's right to privacy by disclosing details of the investigation and nature of Plaintiff's relationship, and information that was otherwise confidential as part of the therapeutic relationship by discussing it with a former DOC Psychologist, Dr. Amy Zirbel, who had no need to know.

39. On June 6, 2023 Ms. Torres notified Plaintiff she was resigning from her position at WRC and their therapeutic relationship was terminating on July 21, 2023.

40. Over the next two weeks Plaintiff tried unsuccessfully to coordinate and plan with Ms. Torres the future of Plaintiff's treatment. She kept putting it off and giving him vague answers.

41. Around this same time, Plaintiff had been notified by Ms. Torres and Mr. Witt that he was being moved to a medium unit. Then this was cancelled. Subsequently, Mr. Witt and another IUS informed Plaintiff he was moving to a medium unit, and told him to pack up and be ready to go that afternoon. This, too, was cancelled.

42. Ms. Torres also had been increasingly cancelling Plaintiff's appointments with her.

43. These issues were causing increased stress for Plaintiff. Ms. Torres had a duty to communicate the future of Plaintiff's treatment with him and failed to do so. As a result of these issues, Plaintiff had a conversation with IUS Rob Kostopolous,

who frequently covered for Mr. Witt when Mr. Witt was not in the institution. Following the explanation of the conflict with Ms. Torres and the other issues regarding Plaintiff's future treatment and unit placement, Plaintiff asked Mr. Kostopolous to look into the issues and meet with Plaintiff and Ms. Torres to be a mediator to work through things. Instead of looking into any issues, he sent an email to Ms. Torres that stated, "[Plaintiff's first name] stopped in for a half hour to complain about you, Susan. I'm sure its all stuff you have heard already. I let him vent and told him that Andrew will check up on him tomorrow." This further caused conflict with Plaintiff and Ms. Torres. The next day she cancelled Plaintiff's scheduled session claiming she needed to attend an emergency meeting about a new resident, whom she wouldn't be involved in his care and when another psych. staff was attending the meeting and treating the resident. Ms. Torres said she did not have any other time to meet that week.

44. Plaintiff felt he had advocated for himself and not been getting any answers or resolution. Plaintiff decided to ask his mother and father to call Ms. Torres and Mr. Witt to advocate on his behalf.. In phone calls to each of his parents on June 22 and 23, 2023, Plaintiff asked his parents to call and specifically advocate for him to be given clear answers and information about the future of his treatment and his transfer to medium, as well as to address the issue of Ms. Torres cancelling their scheduled sessions.

45. On the morning of June 23, 2023, Plaintiff's parents, at his request, left voicemails for both Ms. Torres and Mr. Witt indicating Plaintiff had asked them to call and advocate for him about the previously identified issues.

46. At approximately 12:00 PM on that same day, June 23, Mr. Witt had Plaintiff placed in Temporary Lock Up on unit 11. This was a direct result of Plaintiff having his parents call and advocate for him, and was a decision made jointly by Ms. Torres, Mr. Witt and Ms. Harter.

47. Upon placemnt in TLU, Plaintiff notified Mr. Witt he would not make it through the weekend (June 23 was a Friday), and expressed frustration with being in TLU. Mr. Witt told him

he was not in trouble but would not articulate any reason for the placement other than referencing the phone calls. All three defendants were aware that placing Plaintiff in TLU put him at increased risk of self-harm, suicide and mental decompensation.

48. Plaintiff became suicidal and notified unit 11 staff he was thinking about attempting suicide by cutting his neck. This prompted them to contact Ms. Torres who declined to evaluate Plaintiff or take any measures to prevent Plaintiff from attempting suicide despite knowing his history of significant suicide attempts and her belief that Plaintiff was going to act on his urge to commit suicide. She had a duty to either evaluate Plaintiff, arrange for someone else to evaluate him or have him placed in observation status. Instead she did nothing, thus disregarding Plaintiff's imminent and serious risk of harm.

49. Earlier that day, as a result of Plaintiff asking his parents to advocate for him, Ms. Torres decided to terminate her relationship with Plaintiff without notifying him of this. At 9:11 AM June 23, Ms. Torres emailed Mr. Witt: "We need to talk about [Plaintiff's first and last name]. He is now having his parents call me to "advocate" I see him today because he wants ANOTHER appointment. I may need to step out of his care now..." Ms. Torres then indicated to Mr. Witt via email at 9:54 AM, that she was in "trauma consult" discussing Plaintiff.

50. One of the other psych staff present at trauma consult was Connie Bode. At 2:50 PM (about three hours after Plaintiff was put in TLU), Ms. Bode emailed Ms. Torres stating: "You feeling better?" At 2:51 PM Ms. Torres replied "I feel a huge sense of relief not seeing [Plaintiff's first name]'s face looming nearby at all times! I am quite certain he will self-harm this weekend but I still think it was the right decision to move him now."

51. At 3:05 PM, Ms Torres emailed Ms. Bode: "11 did already call me (after he was told his only options are skills coaching today...). Even a move to High Management won't stop him. I'm waiting for more phone calls from mom and dad." To be clear, Plaintiff had in fact requested skills coaching when he communicated his suicidal ideation. It was Ms. Torres' decision not to provide skills coaching despite her previous agreement with Plaintiff

that she would upon request.

52. In response to Ms. Bode asking about the calls and whether Plaintiff's parents lived separately, Ms. Torres sent an email to her at 3:09 PM stating, "Yes, divorced. It was even creepier that they talked about how much I mean to [Plaintiff's first name] and how grateful they are for the miraculous work I've done with him. That guy must be using up all his phone time talking about me!" In fact, Plaintiff rarely spoke about Ms. Torres on the phone or at all because she did not like him talking about her and he respected her expectation that he not talk about things that happen in session outside of session.

53. At approximately 5:30 PM, after having asked for help and skills coaching, and not receiving any help, Plaintiff, feeling ashamed, worthless, hopeless and suicidal, cut his neck with a razor blade. As a result Plaintiff was taken via ambulance to the emergency room for treatment. His wound was closed using sutures, and he was returned to WRC, and placed in observation status.

54. Plaintiff remained in observation status and TLU for 24 days. Mr. Witt, Ms. Torres and Ms. Harter continued to be the driving force keeping Plaintiff in high management, despite knowing it increased his risk and was detrimental to his mental health. They disregarded the risk and increased stress and continued to keep Plaintiff in high management as a result of his advocacy efforts. This despite the WRC Director, Sue DeHaan, sending an email on July 3, 2023, to Mr. Witt and Ms. Harter after Plaintiff's father contacted her at Plaintiff's request to express concern that Plaintiff was inappropriately placed in high management, in which Ms. DeHaan stated to Witt and Harter, "I assured him that I deeply appreciate his interest in and support of his son, and we would never inflict or tolerate a penalty for a parent calling."

55. On July 17, 2023 Plaintiff was transferred to medium security unit A-1 at WRC. In the following weeks and months, Plaintiff discovered that Ms. Torres had made false statements in his PSU file and at trauma consult, falsely claiming that

Plaintiff had been pushing boundaries. She did not document or communicate that she had engaged in unethical sexual and abusive conduct with and directed at Plaintiff. As a result, Plaintiff was treated negatively by his new therapist and treatment team who communicated to Plaintiff that they did not understand why he remained so upset about how he was treated before he came to their unit. They questioned why he was reviewing his PSU file and why he was so focused on what happened that he had submitted an Open Records request for various documents including Mr. Witt's and Ms. Torres' emails. Ms. Torres' and Mr. Witt's actions and false allegations against Plaintiff caused Plaintiff to be under heavy scrutiny from WRC administration and supervisory staff. Ms. Harter advised staff to find ways to elevate Plaintiff's custody level after she was told it would not be appropriate to do so based on Plaintiff's self-harm. Despite this, Plaintiff received a conduct report for tying a ligature around his neck and Ms. Harter directed that this conduct report be used to elevate Plaintiff's custody, which was inconsistent with normal practice. For example, during this same time period, two other residents on unit A-1 assaulted other residents. This did not prompt any request for custody elevation. Ms. Harter's actions were clearly retaliatory.

56. In September 2023, Ms. Torres either resigned or was fired from her job as a school social worker that she obtained following her resignation from WRC. Her School Social Work provisional license was placed under investigation by the State Department of Public Instruction. This was a result of the sexual relationship Ms. Torres had with another client, as referenced in ¶37, above.

57. In October 2023, Plaintiff was approached by WRC PREA investigators who told him he met a "profile" and they had reason to believe Ms. Torres had sexually abused him. This triggered Plaintiff into a state of emotional distress. Plaintiff was scared, ashamed and otherwise very upset and was crying uncontrollably. Plaintiff initially expressed anger at the institution for how they had allowed Ms. Torres to treat him and the actions taken when he was put in TLU. Out of loyalty and fear, a common trauma response, Plaintiff also claimed he did not want to talk. He

expressed anger with them that now they decided to ask him about what happened after he had been treated like garbage. The PREA investigators stated that the institution had made some serious mistakes and they wre now trying to "right" those "wrongs." Plaintiff remained oppositional and told them that in spite of everything Ms. Torres had done and caused to happen, he didn't want to hurt her or her family by adding to the trouble she was already in, and he didn't want to be responsible for damaging her relationships and her future.

58. Out of concern for Plaintiff's mental health, the PREA investigators asked if there was anyone he would be willing to talk to from the psych services. Plaintiff agreed to speak with Psych. Associate Ashley Spiegelberg, as he had worked with her before and trusted her. Plaintiff subsequently met with Ms. Spiegelberg and provided her a detailed statement of the course of his relationship with Ms. Torres, including the information contained in this complaint. Plaintiff then provided a detailed statement to the PREA investigators.

59. As a result of the abuse and retaliation, Plaintiff has continued to suffer significant emotional distress, flashbacks, nightmares, depression, anger, shame, fear, distrust of staff and especially psychology staff, fear of therapy, and a plethora of other trauma symptoms. The actions of defendants have caused stress in Plaintiff's relationships and caused him to harm himself. Despite it all, Plaintiff spent around six months doing trauma therapy to cope with and process the trauma Ms. Torres inflicted. Plaintiff continues to be affected by Ms. Torres' abuse on a daily basis, and fears that Ms. Torres will somehow hurt him more, and that it feels like she has her fingers still reaching Plaintiff and is causing negative things to happen to Plaintiff.

60. Ms. Torres committed medical negligence by engaging in inappropriate sexual conversation, verbally and emotionally abusing Plaintiff, having sexual contact with Plaintiff, having a dual relationship that affected how she treated Plaintiff, continuing to "treat" Plaintiff after she destroyed the therapeutic relationship by engaging in abusive conduct, inappropriately disclosing Plaintiff's

personal information for the sake of causing him harm and make herself look like she was a victim, not properly handling transference and counter-transference, mishandling the termination of the relationship and not notifying Plaintiff of said termination, taking no action to prevent Plaintiff from from attempting suicide on June 23 when she believed he was going to self harm and retaliating against Plaintiff for having his parents advocate for him. Her actions and/or inactions also violated Plaintiff's Eighth Amendment rights because her behavior fell so far below the standard of care that no reasonable therapist would call it treatment and she did so knowing it would harm Plaintiff. She violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's imminent and substantial risk of suicide. And she violated Plaintiff's First Amendment rights by retaliating against Plaintiff for having his parents advocate for him by having him placed in TLU, terminating their relationship and going on a smear campaign making false statements about Plaintiff claiming he was pushing boudaries.

61. Mr. Witt and Ms. Harter violated Plaintiff's First Amendment rights by retaliating against him for having his parents advocate for him by having him placed in TLU and later having his custody elevated. They knew that Plaintiff, because of his mental health issues and trauma history would be significantly and negatively affected by being placed in TLU and held in high management for exercising his right to petistion the government by having his parents advocate for him, which would cause a reasonable person under the same circumstances, to be chilled from further exercising their rights.

## PRAYER FOR RELIEF

Plaintiff hereby makes his request for this case to be tried to a jury.

Plaintiff requests an award of money damages, compensetory, punitive and/or nominal, the amount of which to be determined by the trier-of-fact.

Plaintiff requests any other such relief the Court may deem just and equitable.

Respectfully Submitted,

John Doe, Plaintiff, pro se.

See VERIFICATION OF COMPLAINT DOCUMENT FOR SIGNATURE